**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>IN RE APPLICATION OF USA PURSUANT TO 18 U.S.C. 3512 FOR 2703(d) ORDER FOR ONE E-MAIL ACCOUNT SERVICED BY APPLE INC.</td><td>ML No. 22-ml-266</td></tr>
</table>

*Reference:      DOJ Ref. # CRM-182-80015; Subject Account: a.c.198035@icloud.com*

**APPLICATION OF THE UNITED STATES**
**FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)**

The United States of America, moving by and through its undersigned counsel, respectfully submits this *ex parte* application for an Order, pursuant to 18 U.S.C. §§ 2703(d) and 3512(a), and the Agreement comprising the instrument as contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance Between the United States of America and the European Union signed at Washington on 25 June 2003, as to the application of the Treaty Between the United States of America and the Kingdom of the Netherlands on Mutual Assistance in Criminal Matters signed at the Hague on 12 June 1981, Neth.-U.S., Sept. 29, 2004, S. TREATY DOC. NO. 109-13 (2006) (hereinafter, the "Agreement"), to execute a request from the Kingdom of the Netherlands ("the Netherlands").  The proposed Order would require Apple Inc. ("PROVIDER"), an electronic communication service and/or remote computing service provider located in Cupertino, California, to disclose certain records and other information pertaining to the PROVIDER account associated with a.c.198035@icloud.com, as set forth in Part I of Attachment A to the proposed Order, within ten days of receipt of the Order.  The records and other information to be disclosed are described in Part II of Attachment A to the proposed Order.

In support of this application, the United States asserts:

## LEGAL BACKGROUND AND JURISDICTION

1.       PROVIDER is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require PROVIDER to disclose the items described in Part II of Attachment A.  *See* 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2.        Pursuant to the applicable treaty, this Court has jurisdiction to issue the proposed Order.  *See* Agreement Annex art. 12 (authorizing courts to issue orders necessary to execute the request).  In addition, this Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711.  18 U.S.C. § 2703(d). Specifically, the Court "is acting on a request for foreign assistance pursuant to [18 U.S.C.] section 3512."  18 U.S.C. § 2711(3)(A)(iii); *see also* 18 U.S.C. § 3512(a)(2)(B) (court may issue "a warrant or order for contents of stored wire or electronic communications or for records related thereto, as provided under section 2703"); 18 U.S.C. § 3512(c)(3) ("application for execution of a request from a foreign authority under this section may be filed . . . in the District of Columbia").

3.       Section 3512 provides:

> Upon application, duly authorized by an appropriate official of the Department of Justice, of an attorney for the Government, a Federal judge may issue such orders as may be necessary to execute a request from a foreign authority for assistance in the investigation or prosecution of criminal offenses, or in proceedings related to the prosecution of criminal offenses, including proceedings regarding forfeiture, sentencing, and restitution.

18 U.S.C. § 3512(a)(1).  This application to execute the Netherlands's request has been duly

authorized by an appropriate official of the Department of Justice, through the Criminal

Division, Office of International Affairs,[1] which has authorized execution of the request and has

delegated the undersigned to file this application.  The undersigned has reviewed the request and

has confirmed that it was submitted by authorities in the Netherlands in connection with a

criminal investigation and/or prosecution.

4.      A court order under § 2703(d) "shall issue only if the governmental entity offers

specific and articulable facts showing that there are reasonable grounds to believe that . . . the

records or other information sought, are relevant and material to an ongoing criminal

investigation."  18 U.S.C. § 2703(d).  Accordingly, the next section of this application sets forth

specific and articulable facts showing that there are reasonable grounds to believe that the

records and other information described in Part II of Attachment A are relevant and material to

an ongoing criminal investigation.

## RELEVANT FACTS

5.      Authorities in the Netherlands are investigating Ali Çakici and others for false

documents and fraud offenses, which occurred from 2006 through June 2021, in violation of the

criminal law of the Netherlands, specifically, Articles 225, 227a, 326, and 47 of the Dutch

Criminal Code.  A copy of the applicable laws is appended to this application.  The United

States, through the Office of International Affairs, received a request from the Netherlands to

---

[1]  The Attorney General, through regulations and Department of Justice directives, has delegated to the Office of International Affairs the authority to serve as the "Central Authority" under treaties and executive agreements between the United States and other countries pertaining to mutual assistance in criminal matters.  *See* 28 C.F.R. §§ 0.64-1, 0.64-4, and Appendix to Subpart K, Directive Nos. 81B and 81C (2018).

provide the requested records to assist in the criminal investigation and/or prosecution.   Under

the Agreement, the United States is obligated to render assistance in response to the request.

6.      According to authorities in the Netherlands, Ali Çakici and others are involved in

a scheme to defraud the Dutch government of benefits by filing false claims for the purpose of

receiving monthly stipends.  The Dutch government offers several benefits programs through the

Employee Insurance Agency ("EIA").  The Work and Income Act ("WIA") provides income to

individuals who became ill while receiving unemployment benefits.  WIA allows an individual

to apply for benefits ninety-one weeks after reporting their illness under WIA.  WIA will become

available to an individual if the employee is still unable to work and suffered a loss of income

104 weeks after first declaring their illness, and the person is still unable to perform the duties of

their current position or be re-integrated into the workforce.  Within four to six weeks of filing a

WIA application, an EIA medical advisor assesses the applicant's work options.  During the

same period, an EIA ergonomist reviews the applicant's file if the initial medical assessment

determines the applicant is potentially eligible for work.  WIA benefits distinguish between

individuals determined to have a full and permanent disability (referred to as the "IVA-benefit")

and those who are partially disabled (referred to as the "WGA-benefit").  If it is determined that

the applicant is unfit for work, the applicant is eligible for the IVA-benefit.  The WGA-benefit

supplements the incomes of partially disabled employees.  A beneficiary's disability is always

subject to further assessment.  The law requires that a beneficiary notify EIA of any changes in

their situation including income, work, health, or living conditions.

7.      A file review conducted by the Criminal Information Team suggests that Ali

Çakici's fraud scheme began in 2006.  Investigators identified 200 files that they suspect

contains false information for the purpose of obtaining benefits.  Dutch authorities refer to the

persons seeking benefits while collaborating with Ali Çakici to defraud the benefit system as "pseudo-patients."  On average, the pseudo-patients received a benefit of EUR 1,000 (approximately USD 1128) per month resulting in an annual loss amount of EUR 2,400,000 (approximately USD 2,708,352) for the Dutch government.

8.      The investigation has identified Pseudo-Patient 1, as receiving benefits on false grounds.  According to Dutch authorities, Pseudo-Patient 1 received WGA-benefits between 2017 and 2019.  In August 2019, Pseudo-Patient 1 began receiving IVA-benefits.  A court authorized wiretap and surveillance established that in June 2019 Pseudo-Patient 1 paid Ali Çakici EUR 5,000 (approximately USD 5642), and that Pseudo-Patient 1, her husband, and her adult son meet with Ali Çakici prior to her doctor appointments to receive instructions on what to say when in the doctor's office.  The aforementioned investigative techniques also established that Pseudo-Patient 1 worked on a regular basis at her daughter's shop and her son's restaurant, while claiming she was unfit to work. Pseudo-Patient 1 did not report her work to EIA as required.  Pseudo-Patient 1 received her IVA-benefits in August 2019 after she and her husband had an appointment with the EIA.  When questioned by authorities, Pseudo-Patient 1initially denied knowing Ali Çakici.  After being confronted with the recordings, Pseudo-Patient 1 confirmed that she knows Ali Çakici but is unable to recall anything more about their meetings.

9.      An Investigating Judge appointed an independent medical expert to examine several suspected case files.  The medical expert determined that there were certain similarities between the four or five files he examined, including the responses given by individuals to questions and the descriptions of the individuals' clinical issues.  According to Dutch authorities, criminal investigators do not have access to medical files because of medical confidentiality.

10.      Utilizing court authorized wire taps and historical traffic data, investigating

authorities identified Ali Çakici's telephone number as 3XXXXXX9664.  Investigators

identified Ali Çakici's e-mail account as a.c.198035@icloud.com from the interceptions.

11.      Based on the telephone information and surveillance from May 2019 to the

summer of 2021, investigators identified benefits cases that demonstrate Ali Çakici collaborated

with pseudo-patients to obtain IVA- or WGA- benefits through fraudulent means.  According to

investigating authorities, Ali Çakici and co-suspects, some of whom are also family members,

consulted with or accompanied the pseudo-patients to their meetings with medical professionals

and ergonomists where misrepresentations were made for the purpose of obtaining WIA-benefits

or increasing existing benefits.  Through wiretap data and surveillance, investigators determined

that Ali Çakici asks for a one-time payment of EUR 6,000 (approximately USD 6771) and a

yearly payment of EUR 1,000 (approximately USD 1128) for his services with EIA.

12.      Through interceptions, investigators identified telephone number

3XXXXXX9664 as belonging to Pseudo-Patient 2.  The telephone number 3XXXXXX6333 is

registered in the name of "A. Çakici," which was determined to be Ayten Çakici based on the

conversations.  The recorded conversations for the latter phone number showed Ayten Çakici,

who is related to Ali Çakici, mediating on behalf of Pseudo-Patient 3.  The two phone numbers

also revealed discussions about other pseudo-patients emailing Ali Çakici.  In one conversation

there is a discussion about an e-mail sent to an attending psychologist of one of the pseudo-

patients, and how the message was forwarded to Ali Çakici.

13.      On July 5, 2021, a search warrant was executed at Ali Çakici's residence, and his

mobile phone was seized.  A forensic analysis of the phone showed that Ali Çakici was using the

e-mail account a.c.198035@icloud.com.  Investigators found chat messages between individuals

and Ali Çakici about attempts to obtain benefits under WIA on false grounds.  One of the

persons messaging with Ali Çakici was Pseudo-Patient 4.  On February 28, 2021, Pseudo-Patient 4, using his Hotmail account, contacted Ali Çakici at a.c.198035@icloud.com.  Investigators were able to extract the log information, but the content of the e-mail was deleted.  Investigators also recovered chat messages between Ali Çakici and Pseudo-Patient 4 from March 2021 in which the two discussed doctor appointments.

14.      On September 7, 2021, investigators interviewed Pseudo-Patient 4.  According to Pseudo-Patient 4 he knows Ali Çakici from the mosque, and he helps Pseudo-Patient 4 with the translation of important documents.  EIA records show that Pseudo-Patient 4 contacted EIA on December 19, 2019, to declare he was ill.  According to EIA records, Pseudo-Patient 4 applied for IVA-benefits on September 15, 2021.

15.      The phone analysis also identified WIA documents including a benefits application form for Pseudo-Patient 5.  The actual e-mail exchange corresponding to the application was not found.  However, on April 23, 2021, there was an e-mail exchanged between Pseudo-Patient 5's Gmail account and Ali Çakici at a.c.198035@icloud.com.  Investigators recovered the log information for the latter e-mail, but the corresponding e-mail message was deleted.  Investigators found records from a psychiatrist, who had previously come up during the investigation, for Pseudo-Patient 5 during the search of Ali Çakici's residence.  According to EIA records, on June 6, 2021, Pseudo-Patient 5 applied for benefits.

16.      Dutch authorities are seeking non-content information from PROVIDER to determine if Ali Çakici used the e-mail account a.c.198035@icloud.com to communicate with any more of the alleged pseudo-patients identified by investigators thus far.

## REQUEST FOR ORDER

17.      The facts set forth above show that there are reasonable grounds to believe that

the records and other information described in Part II of Attachment A are relevant and material

to an ongoing criminal investigation.  Specifically, these items will help authorities in the

Netherlands identify and locate the individual(s) who are responsible for the criminal activity

under investigation, and to determine the nature and scope of that criminal activity.

Accordingly, the United States requests that PROVIDER be directed to produce all items

described in Part II of Attachment A to the proposed Order within ten days of receipt of the

Order.


Respectfully submitted,

VAUGHN A. ARY
DIRECTOR
OFFICE OF INTERNATIONAL AFFAIRS
OK Bar Number 12199

By: Tracy M. Johnson
Trial Attorney
WI Bar Number 1023069
Office of International Affairs
Criminal Division, Department of Justice
1301 New York Avenue, N.W., Suite 800
Washington, D.C.  20530
(202) 616-1487 telephone
(202) 514-0080 facsimile
Tracy.Johnson2@usdoj.gov

## Relevant Provisions of the Dutch Criminal Code

**Article 225**

1.  A person who falsely prepares o[r] forges a document that is to serve as evidence of any fact, with the object of using it as being genuine and authentic or of having it used as such by others, is guilty of forgery of documents and is liable to a term of imprisonment of not more that six years or a fine of the fifth category.
2.  The punishment in Paragraph 1 is also applicable to a person who intentionally makes use of the false o[r] forged document as if it were genuine and authentic, or who intentionally delivers or has at his disposal such document, where he knows or should reasonably suspect it to be used in such manner.
3.  Where an act, as described in the first or second Paragraph, is committed with the intention of preparing o[r] facilitating a terrorist offense, the term of imprisonment for the commission of the act is increase by one third.

**Article 227a**

A person who, by any means other than by forgery of documents, intentionally provides untruthful information to a person, who grants any benefit or allowance or through whose agency the same is granted, if such act may benefit himself or another whilst knowing or having reasonable cause to know that the information provided is relevant for determining his right to that contribution or allowance or another's right thereto or for the amount or the duration of such contribution of allowance, is liable to a term of imprisonment not more than four years or a fine of the fifth category.

**Article 326**

1.  A person who, with the object of obtaining unlawful gain for himself or another, induces a person, by assuming a false name or false capacity, or by artful tricks, or by a tissue of lies, to surrender any property, to render a service, to make data available, to incur a debt or renounce a claim, is guilty of fraud and liable to a term of imprisonment of not more than four years or a fine of the fifth category.

2.  Where an act, is committed with the intention of preparing o[r] facilitating a terrorist offense, the term of imprisonment for the commission of the act is increased by one third.

**Article 47**

1,  The following persons are liable as perpetrators:
    1.  those who commit, who cause to be committed or who co-perpetrate in the offense.
    2.  those who, by means of gifts, promises, abuse of authority, use of violence, threats or deception or providing the opportunity, means or information, intentionally solicit the commission of an offense.

2.      With regard to the last category, only those actions intentionally solicited by them and the consequence of such actions are to be taken into consideration.